IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04cv08

DORIANA VLADIMIROVA FARIS
individually and as Administratrix of the
ESTATE OF ASHLEY ALEXANDER
FARIS,

        Plaintiff,

v.

SFX ENTERTAINMENT, INC.,
d/b/a CLEAR CHANNEL
ENTERTAINMENT,

        Defendant.

**ORDER**

## INTRODUCTION

This cases arises from the electrocution death of Ashley Faris, at Defendant SFX Entertainment, Inc.,'s Verizon Wireless Amphitheater in Charlotte, North Carolina, on June 6, 2003. On December 1, 2004, the defendant filed a series of motions for summary judgment, one of which sought judgment on the plaintiff's claim for punitive damages, which was granted on September 1, 2006. Presently before the Court is the plaintiff's motion for reconsideration pursuant to Federal Rule of Civil Procedure 54(b).

The plaintiff asks the Court to reconsider her claim for punitive damages on two different grounds. First, she contends that Chambliss v. Health Sciences Foundation, Inc., 626 S.E.2d 791 (N.C. Ct. App. 2006) constitutes an intervening change in North Carolina law with respect to

1

punitive damages.  Second, she contends that the Court clearly erred in failing to read the facts in a light most favorable to the her in its previous Order.

The defendant, not surprisingly, contests re-litigating a battle already won. Characterizing reconsideration as an "extraordinary remedy," it urges the Court not to allow re-argument in the interest of finality.  The defendant correctly points out that Chambliss is neither intervening nor a change in law.  It was decided six months prior to the Court's initial order, and it does not overrule any case cited by the Court in its ruling.  The defendant argues further that the Court did not commit clear error in its factual rendition.

Nonetheless, the issue (of punitive damages) is a close one, there are few published cases construing the amended statute, and the grant of partial summary judgment is interlocutory in nature. Mindful of Justice Frankfurter's admonition that "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late,"[1] the Court will exercise its discretion to reconsider the Summary Judgment Order. American Canoe Association, Inc. v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003) (the Court "retains the power to reconsider and modify its interlocutory judgments, including partial summary judgment, at any time prior to final judgment when such is warranted").

If the Court failed to construe all facts in a light most favorable to the plaintiff, the section below corrects that error and explains the source of the Court's conclusions.  Upon review of those facts, the law, and the parties' arguments, the Court finds no basis to alter its holding, namely, that a reasonable jury could not find that the defendant consciously and intentionally disregarded  and

---

[1] Henslee v. Union Planters Nat. Bank & Trust Co., 335 U.S. 595, 600 (1949) (Franfurter, J., dissenting)

was indifferent to the rights and safety of the plaintiff, which it knew or should have known was reasonably likely to result in injury, damage, or other harm.

**FACTUAL FINDINGS IN A LIGHT MOST FAVORABLE TO THE PLAINTIFF**

*EVENTS OF JUNE 6, 2003*

On June 6, 2003, Ashley and Doriana Faris and a group of friends attended a concert at the Verizon Wireless Amphitheater featuring the Red Hot Chili Peppers and Snoop Dogg. It rained throughout the concert. At one point, Mr. Faris and his friend Travis Creech left to use the restroom. Walking barefoot down the wet south plaza stairwell, Mr. Faris stepped on either an electrified metal stair tread or the faceplate of a light fixture recessed into the stair. He was fatally electrocuted when he touched the metal handrail, completing the circuit with the stairwell.

*EVENTS OF MAY 30, 2003*

The pertinent facts surrounding the events of a James Taylor concert on May 30, 2003, one week prior to the death of Mr. Faris, are materially undisputed .[2]

On May 30, two patrons walking together received electric shocks on the south plaza stairwell and reported the incident to a police officer, Sergeant Mark Faulkenberry, who was located near the stairwell. Sgt. Faulkenberrry relayed the reported shocks to his superior, Captain David Graham, who in turn reported the shock to Katherine Marshall, the Director of Event Operations with the Amphitheatre. She used her radio to report the incident to Kevin Lynch, Director of Facility Operations, and the on-site medical team. (Marshall TR at pp. 78 and 88). Marshall took no further action at any time to determine what was done to repair the source of the reported shock. The

---

[2] While the Court reads the evidence in a light most favorable to the plaintiff, it need not ignore undisputed facts proffered by the defendant, nor must it treat as evidence any unsupported speculations. General Mills. Inc. v. Hunt-Wesson, 103 F.3d 978, 980 (Fed. Cir. 1997).

defendant's 30(b)(6) designee admitted that Marshall's failure to inform her supervisor, Executive Director Della Rowser, was a violation of an unspecified company policy. (Rogers TR at p. 51, line 14 - p. 52, line 15).

After being contacted by Marshall, Lynch immediately went to the south plaza stairwell looking for someone who had reported being shocked, but found no one. He then ran to the north plaza stairwell to check it as well. He did not find anyone there either, but spoke to two different police officers to determine if they had called in the report, neither of whom had done so. While at the north plaza stairway, Lynch also instructed one of his maintenance workers, Ron Jackson, to tape what he believed was a loose faceplate on one of the stairs. (Lynch TR at pp. 127-130).[3] Lynch then returned to the south plaza stairwell, the site of the original complaint, to take another look and asked a police officer who was on the lawn near the stairway if he had called in the report. The officer, later determined to be Sgt. Faulkenberry, confirmed that he had.

Sgt. Faulkenberry told Lynch that two patrons received the shock on the second stair down on the right,[4] and told Lynch that the patrons did not want or need medical treatment and had returned to watch the show. By this time, Ron Jackson had finished taping a lose faceplate in the

---

[3] This is the first of two faceplates taped up by Lynch, a fact absent from the plaintiff's pleadings but not disputed by any evidence.

[4] The plaintiff would like to dispute this fact, but has provided no contrary evidence. Lynch testified numerous times that Sgt. Faulkenberry told him that the second light down on the right (looking from the top of the stairs) caused the reported electric shock. (Lynch TR at pp. 137, 142, 144). The plaintiff asserts without support that Sgt. Faulkenberry never pointed to or referenced a particular stair, step or light during his discussion with Lynch, but rather only referenced a general area. (Doc. No. 63: Plaintiff's Response at 8). For reasons unknown to the Court, Sgt. Faulkenberry was never deposed nor has the plaintiff provided anything but assertion to make this fact a disputed one.
Apparently the reason for plaintiff's assumption that Sgt. Faulkenberry did not point to any particular light is that the light attended to was ultimately determined not to be the source of the electrical hazard (See Wilson Rogers' TR at pp. 167-168). This is mere speculation. It is not supported by the evidence nor required by the deferential summary judgment standard.

north plaza stairway and had caught up to Lynch. Lynch and Jackson visually inspected the fixture on the step identified by the officer, but it appeared to be functioning fine. Lynch brushed the back of his hand across the light fixture and testified that he did not receive any current.[5] He then told his employee, Ron Jackson, to tape-off this light fixture with electrical tape as well. Later in the evening, Lynch returned to the south plaza stairway to confirm that Jackson had taped the metal faceplate on the second stair and found that he had done so. (Lynch TR at p. 154). Despite their knowledge of the reported incident, no one ever de-energized power to the stairwell, blocked access to the stairwell, posted a sign nor warned their patrons of the danger in any manner.

A few days later, Lynch spoke with Robert Miles, an electrician sub-contractor who performed all electrical work on the Amphitheatre. Lynch explained what had occurred, and discussed the fact that the particular fixture referenced by Lynch was operational, with the faceplate

---

[5] The plaintiff argues the Court violated the summary judgment standards by "imply[ing] that Lynch intentionally brushed his hand across the light fixture" (Doc. No. 82: Motion to Reconsider at 16). The Court now sees that it was not intentional.
        Q. . . .But my question was I believe you said you may have touched, that is with your hand touched the face plate.
        A. I think my knuckle brushed it, yes.
        Q. Brushed it, while you were putting the first piece of tape on it.
        A. Right.
(Lynch TR at p. 152, lines 14-21). Based upon this evidence, the Court retracts from its fact-finding any implication that the hand brush was intentional. The accidental/intentional distinction was not readily apparent in the plaintiff's pleadings or submission of deposition transcripts. For example, the plaintiff recites the facts of Lynch brushing his hand across one of the light fixtures in her Response at page 8, yet did not point out the accidental nature of this action or provide the above-quoted deposition transcript. Furthermore, the portion of the deposition transcript the plaintiff did provide included the following testimony of Lynch regarding his conversation with Miles:
        A. . . . [Miles] said, Was the fixture working? I said, Yes, the fixture was working. I said, I even brushed my hand against it and I think Ron said he brushed his hands all over it and he hadn't gotten a shock. (Lynch TR at p. 156, lines 14-18).
        The Seventh Circuit must have had cases like this in mind when it said: "Judges are not like pigs, hunting for truffles buried in briefs." United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991). The implied intentionality of the act seemed supportable. Although the Court is not required to ferret through the record on behalf of either party, such ferreting would not have revealed the distinction the plaintiff now claims to be significant. At the end of the day, the intentionality of the hand brush is not material; either way Lynch did not receive a shock after touching the light fixture he thought was at issue, which contributed to his belief in the lack of danger. No reasonable jury could find it any other way.

attached. They discussed the possibility of moisture in the light fixture as the hazard. (Lynch TR at p. 163). Lynch turned down his offer to look at the light fixture because Lynch wanted to handle it himself and to simply let Miles know if he needed anything further.[6] Miles made no contemporaneous complaint about this approach. There is no indication he disapproved. Lynch testified that he checked the particular light fixture for moisture, discerned there was none, and removed the electrical tape.[7]

*PRIOR ELECTRICAL HAZARDS*

The other set of facts asserted by the plaintiff to show willful or wanton conduct involve certain electrical hazards that were repeatedly ignored. Lisa Austin, General Manager of ARAMACK'S, a third party company that provides goods and beverage concessions for the Ampitheatre, testified to numerous different electrical problems, two of which were reported and yet

---

[6] The plaintiff faults the Court's alleged reliance upon the fact that "Lynch didn't take further action because Miles told him that 'it sounds like static electricity.'" (Doc. No. 82: Motion for Reconsideration at 15). However, the Court expressly recognized this dispute in its Order: "Miles, however, denies having said this, and testifies that Lynch turned down his offer to look at the light fixture because Lynch wanted to handle it himself and to simply let Miles know if he needed anything further." (Doc. No. 79: Order at 8-9). Accordingly, the Court did not rely upon Lynch's testimony regarding the disputed fact of Miles' statement regarding static electricity, and thus properly read the facts in a light most favorable to the plaintiff. The plaintiff's argument that the Court must find that Lynch lied about the "static electricity" comment is not supported by the evidence.

[7] The plaintiff argues the Court violated the summary judgment standard when it stated, "Lynch removed the tape from the light fixture precisely because he believed it was safe." (Doc. No. 79: Order at p. 8). The Court confirmed this reading of the facts from the uncontested facts presented by the plaintiff in her Response at 12: "Lynch testified that he checked the particular light fixture for moisture, discerned that there was none, and then removed the electrical tape," and cited to Lynch Deposition, p. 164, lines 9-14. A plain reading of the deposition as cited in the plaintiff's rendition of the facts implies that the tape was removed, or not placed back, after determining there was no moisture in the fixture. The plaintiff now argues, however, that "Mr. Lynch's testimony reveals that he removed the tape because he then had to remove the faceplate of the light fixture to check for moisture, pursuant to Mr. Miles' instructions," (citing to Lynch Deposition, p. 164, lines 2-14), and continues, "[t]here is no evidence that Mr. Lynch removed the tape because he thought the light fixture was safe." Because the tape was placed on the fixture upon suspicion that it was unsafe, and discussion between Lynch and Miles pertained to moisture being a possible cause of the hazard, the only reasonable conclusion that could be drawn was that Lynch's decision to remove the tape to check for moisture and not re-tape the fixture after finding no moisture was a result of his belief that the fixture was safe.

6

went unaddressed by SFX. First, she reported a flooding problem in the small building in which she worked, which required her to keep power cords elevated above the water. The hazard was reported to Lynch on three or four occasions, to Lynch's predecessor as Director of Facility Operations, D.J. White, and to Della Rowser. This hazard existed for over a year and was corrected only after Mr. Faris's death. (Austin TR at p. 28, line 4 - p. 29, line 17, and p. 33, lines10-12). Austin testified that she was scared about being electrocuted in her office. (Id. at p. 32, line 18 - p. 33, line 5). Neither Lynch, Rowser, Marshall, nor any other Clear Channel representative ever came to visually inspect the flooding problem. (Id. at p. 33, line 21 - p. 34, line 4). Second, she reported to Lynch that flooding would cover an electric box adjacent to a walk-in cooler, but the hazard was not fixed until after Mr. Faris's death. (Id. at p. 34, line 17 - p. 35 line 21, and p. 36, lines 12-25). Lastly, Austin testified that the reason given to her for not fixing the electrical hazards was that they did not have enough money to fix the problems because it had to come out of capital the following year. (Id. at 31, lines 3-23 and p. 48, lines 1-10). Since the time Clear Channel Entertainment acquired the Amphitheater, there had never been a full inspection of the electrical systems at the Amphitheater, nor was any type of routine maintenance of the electrical systems at the Amphitheater performed. (Rogers TR at p. 104, line 9 - p. 105, line 1). There were no reports, however, of anyone actually being shocked or otherwise injured by these examples of prior electrical issues.[8]

---

[8] The plaintiff emphasizes that Della Rowser, the defendant's Executive Director at the Amphitheater, testified that safety is not the defendant's first priority and that customer safety was not more important that meeting financial goals. (Della Rowser TR, p. 25, lines 3-25). This is a strained reading of the testimony, one no reasonable jury could give. The context of her testimony reveals her intent was to emphasize that SFX places great importance on everything, and that she did not want to say that one thing is more important than another. Furthermore, she did specifically acknowledge that patron safety is "very important." The plaintiff's reading is akin to saying murder is not a priority of the Ten Commandments in as much as it is listed fifth (or sixth depending on which version). Rowser's deposition testimony taken in context does not support the plaintiff's conclusion that safety was not important. The Court will not distort the plain meaning of words or conveniently read them out of context. Sylvia Dev. Corp. v. Calvert County, MD., 48 F.3d 810, 821-22 (4th Cir. 1995).

## *VIOLATION OF COMPANY POLICIES*

Wilson Rogers admitted the following omissions violated the defendant's policies: (1) Lynch and Marshall's failure to report the May 30, 2003 electrical shock to their superior Della Rowser, the highest-ranking manager at the Amphitheater; (2) Lynch and Marshall's failure to document or make any written report of the May 30, 2003 electrical shock; and (3) Lynch and Marshall's failure to bring up the subject of the May 30, 2003 electrical shock at the following Tuesday's management meeting at the Amphitheater. (Rogers TR at p. 58, lines 8-21). He also agreed that the actions and inactions relating to the circumstances surrounding Mr. Faris's death constituted the greatest departure from SFX's guidelines and procedures that he had ever seen in his lengthy tenure as an officer of SFX. (Id. p. 85, line 6 - p. 86, line 2, and p. 87, line 14 - p. 88, line 6, and p. 130, lines 4-13). He was never asked nor did he provide any specific written policies, guidelines or procedures that were violated.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. The nonmoving party may not rely upon mere allegations or denials of allegations in her pleadings to defeat a motion for summary judgment. Id. Evidence that is not supported is insufficient to defeat a motion for summary judgment. Id. at 323-24. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995). When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. However, "a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## ANALYSIS

Chapter 1D-15 of the North Carolina General Statutes was enacted on January 1, 1996.

To succeed on her claim for punitive damages, the plaintiff must prove (1) the aggravating factor of willful or wanton conduct (2) by clear and convincing evidence. N.C. Gen. Stat. § 1D-15 (2003). The clear and convincing evidence standard is a greater burden than preponderance of the evidence, and must fully convince the trier of fact. Schenk v. HNA Holdings, Inc., 613 S.E.2d 503, 508 (N.C. Ct. App. 2005). "Willful or wanton conduct" is defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen. Stat. § 1D-5(7). To award punitive damages against a corporation, "the officers, directors, or managers of the

9

corporation [must have] participated in or condoned the conduct . . . ." N.C. Gen. Stat. § 1D-15(c). Willful or wanton conduct is "more egregious than gross negligence." N.C. Gen. Stat. § 1D-5(7).

The issue in the instant case, therefore, is whether the plaintiff has forecasted evidence from which a reasonable jury could find by clear and convincing evidence that the defendant consciously and intentionally disregarded and was indifferent to the rights and safety of others, which the defendant knew or should have known was reasonably likely to result in injury, damage, or other harm. She has not. The Court finds once again that according to the standards set forth by the North Carolina statute, as interpreted, no reasonable jury could find that the defendant acted in a willful or wanton manner.

The plaintiff contends that Chambliss v. Health Sciences Foundation, Inc., 626 S.E.2d 791 (N.C. Ct. App. 2006), which was decided after the initial submission of briefs but six months before this Court's initial order, constitutes an intervening change in North Carolina law. This Court was cognizant of Chambliss at the time of its original order, and gave it careful regard. As explicitly done below, the Court concludes that the facts of the instant case do not amount to willful or wanton conduct as interpreted by Chambliss.

In Chambliss, the plaintiffs hired Defendant Health Sciences to provide artificial insemination services. The defendant had very specific safety procedures for preparing sperm samples, including:

> [1] confirming the donor number with the patient, [2] matching the donor number in a log book, [3] logging the donor sperm out of the sperm freezer, [4] having two individuals initial this process, [5] labeling the specimen, [6] showing the vial of sperm to the patient and [7] reconfirming the donor number, [8] checking the specimen under a microscope and [9] charting this process in the patient's medical chart.

Id. at 793. The purpose of this step-by-step procedure was to safely separate the non-pre-washed sperm from the pre-washed sperm, so as to avoid an injury that was known to occur if the procedure was not followed. The appeals court concluded that, "[n]one of the policies and procedures in effect at appellants' facility to prepare a sperm specimen for insemination and protect patient health and safety were performed. . . ." Id. at 794. Accordingly, the court also found that the defendant "knowingly, consciously, and deliberately used an unlabeled syringe containing unknown substance in the plaintiff's insemination procedure . . . knowing that to do so would expose the patient to risk of harm." Id. at 795; see also Abel v.Carolina Stalite Co. Ltd., No. 02-892, 2004 WL 691748 (M.D.N.C. Mar. 18, 2004) (punitive damages claim survived summary judgment where the defendant drove a front-end loader in the up position, which completely obstructed his field of vision, when he knew or should have known that two other trucks where somewhere in front of him, which was equivalent to intentionally driving blindfolded).

In the instant case, no evidence has been adduced to show that the defendant consciously and intentionally chose to disregard established policies and procedures that were in place to protect the safety of customers from the injury suffered by the decedent with knowledge of the consequences of such disregard. The totality of conduct by Lynch demonstrates the opposite: a failure to foresee the consequences of his unwittingly ineffective efforts. The defendant's demonstrated failures to correct other electrical issues also do not establish conduct sufficient to come within the Act. Finally, the communication failures in violation of unspecified company policies are different in kind and degree from that present in Chambliss. The catastrophic nature of the injury suffered in this case is insufficient to bring defendant within the purview of the punitive sanction of N.C. Gen. Stat. 1D.

This case is more like <u>Collins v. St.George Physical Therapy</u>, 539 S.E.2d 356 (N.C. Ct. App. 2000), where a patient of a physical therapist was injured when a cable broke on a workout machine, causing the weight to strike him on the head. The machine dealer had replaced the particular cable on two prior occasions, and the defendant attempted to have the cable replaced a third time. Unable to obtain one from the dealer, the defendant took it upon himself to purchase and install a substitute cable. He had no official training in weight machine repair, and failed to attach the cable in the proper way. He tested the cable multiple times, and it seemed safe to him. However, due to the improper assembly of the cable, it gave way and injured the plaintiff. The court found that this ineffective effort did not amount to wilful or wanton behavior.

In its application of North Carolina law, the Western District of North Carolina previously found insufficient evidence of willful or wanton conduct in <u>Strawbridge v. Sugar Mountain Resort Inc.</u>, 320 F. Supp. 2d 425 (W.D.N.C. 2004), where a skier broke his spine because of the resort's failure to fix bare spots on a slope. The resort knew or should have known that seven skiers had been injured during the last twelve days due to bare spots, that many slopes had been closed for lack of snow, and that the forecast called for temperatures in the 40's with rain. There was no evidence that the defendant tried to cover the bare spots or post warning signs. Accordingly, there was sufficient evidence of negligence to withstand summary judgment, yet insufficient evidence for punitive damages to withstand summary judgment.

The Middle District of North Carolina, however, found sufficient evidence of punitive damages for jury deliberation in <u>Snow v. Oneill</u>, No. 04-681, 2006 WL 1837910 (M.D.N.C. June 5, 2006), where a truck driver, cognizant of the risk involved, ignored the known federal regulation of using hazard lights and reflective triangles when parking his truck on the side of the road to sleep.

The court found that the driver's conscious failure to follow these policies, his awareness of the precise danger in parking on the side of the road, his knowledge that a rest area was 1 1/2 or 2 miles up the highway, and the disputed facts about whether there was residual snow or ice on the road, possibly amounted to willful or wanton conduct. As will be shown below, the instant case is not sufficiently comparable because of Lynch's lack of knowledge and his assertive, albeit ineffective effort to resolve the problem as he knew it to exist.

When the facts of the instant case, considered in a light most favorable to the plaintiff, are analyzed in light of relevant case law, the plaintiff's claim for punitive damages cannot survive summary judgment scrutiny.

*EVENTS OF MAY 30, 2006*

The events of May 30, 2003 and the week following do not show a conscious and intentional disregard for the safety of others with knowledge or imputed knowledge of the injurious consequences. There may well be a plethora of evidence pointing to negligence, but no reasonable jury could find evidence sufficient to award punitive damages under North Carolina law.

Lynch's actions show far more caution and attentiveness to the electrical hazard than those shown by the defendant in Sugar Mountain, who did nothing to correct problems known to have caused injuries. Lynch searched for the source of the reported shock, questioned three police officers, visited the north stairwell once and the south stairwell three times,[9] taped off two different light fixtures, consulted with an electrician on the phone a few days later, returned to the light fixture

---

[9] Lynch first went to the south stairwell looking for someone who had reported being shocked, then went to the north stairwell, then returned to the south stairwell where he met with Sgt. Faulkenberry and instructed Ron Jackson to tape off a light fixture, and later that evening he returned to the south stairwell for a third time to make sure Jackson did as instructed. He also returned at least once more a few days later, for a fourth time, after speaking with Mills about the fixture.

13

believed to have been the source of the problem a fourth time, checked for moisture, and determined that there was none. These facts may not show effective effort, but they do show assertive effort inconsistent with disregard or indifference to the safety of others. Recognition of this effort to resolve the problem does not mean the Court has failed to view the facts in a light most favorable to the plaintiff, as she argues in her motion for reconsideration, for they are materially undisputed; rather, it emphasizes the lack of disregard and lack of indifference to the danger as it was known or should have been known.

Additionally, a reading of the facts in a light most favorable to the plaintiff does not produce evidence that Lynch intentionally turned a blind eye to the danger: he looked, he saw, and he acted. Unfortunately, and possibly negligently, he looked in the wrong place, saw the wrong thing, and took ineffective action. This is incomparable, however, to a case like <u>Chambliss</u> in which the nurse, in contravention of clear safety procedures, looked at the wrong syringe, saw the danger involved in using the wrong syringe, and used it despite the known danger. <u>St. George</u> is more similar to the case at bar in that there was an attempt to remedy the problem, the attempt was ineffective, and the ineffectiveness resulted in tragic injury.

The plaintiff has not shown the Court that Lynch or any other SFX employee had a more acute understanding of the danger at hand, or that they intentionally disregarded the limited information available to them. As in <u>St. George</u>, Lynch took steps that he thought would correct the problem. That fact that he was wrong in that assessment does not establish a conscious and intentional disregard and indifference to the rights and safety of others. The actions taken by Lynch may not have been the actions of a prudent man, but they were not the actions of a wanton man subject to punitive damages.

14

## PRIOR ELECTRICAL HAZARDS

The plaintiff argues that when looked at in a light most favorable to her, evidence of prior electrical hazards that went unattended reflects a *modus operandi* of ignoring safety hazards in order to save money. In making this argument, the plaintiff does not rely on an intervening change in law, additional evidence or clear error. She recognizes that the Court has considered the evidence (Doc. No. 82: Motion for Reconsideration at 19). She simply disagrees with the Court's legal conclusion drawn from that evidence:

> In determining that SFX's failure to correct these pre-existing problems did not rise to the level of willful or wanton conduct, the Court stated, on page 9 of its Order, "there is no evidence of the severity of these allegations, no evidence of harm resulting from these hazards, nor causal connection to the electrical malfunction in the instant case." However, the evidence, when viewed in the light most favorable to the Plaintiff, shows otherwise.

Id. at 21. The Court agrees with the defendant that the plaintiff is merely rearguing her evidence in the wake of an adverse judgment. Reconsideration by re-argument is not proper under Rule 54.

## VIOLATION OF COMPANY POLICIES

The plaintiff fails to provide with specificity which safety policies SFX employees consciously and intentionally ignored. The plaintiff argues that Clear Channel Vice President Wilson Roger's deposition reveals an admission of a complete failure to follow safety policies and procedures. The plaintiff cites Roger's deposition in which he testified, "the only thing that was done correctly was the events manager called the maintenance director and advised him of the problem," and that aside from this, there was a total failure of those individuals in their capacities as directors of event operations to follow the regulations and procedures that were in place. (Rogers TR at p.85, lines 11-24). In her Response, the plaintiff argues that Rogers "admitted that Marshall's

15

failure to inform Rowser of the May 30th incident violated Defendants' company policies." (Doc. No.63 at 8). Her citation to his deposition establishes nothing more than uncontested facts that the employees varied from the rules and training that required the communicating and the sharing of information. (Rogers TR at p. 51, line 14 - p. 52, line 15). Additionally, Rogers confirmed that it was a violation of the defendant's rules and regulations to not discuss the May 30th incident at the weekly meeting following the events. (Rogers TR at p. 58). Thus, the procedures violated in this case involved the failure to report the previous incident to management.

These facts are much different than those in Chambliss and related cases, see e.g. Snow v. Oneill, supra at 12, which involved the failure to follow clearly defined safety protocols to avoid a known harm. No evidence has been shown of specific safety procedures or proof that they were deliberately ignored, despite a known risk of injury that would be caused by doing so. Thus, violation of a communication policy in the circumstances of this case is insufficient to establish willful or wanton conduct by clear and convincing evidence. Unlike the plaintiff in Chambliss, there exists no evidence that the defendant consciously and intentionally chose to disregard established policies and procedures that were in place to protect the safety of customers from the injury which the decedent ultimately suffered with knowledge of the consequences of such disregard.

## CONCLUSION

Having granted the plaintiff's request to reconsider its grant of summary judgment, the Court has reviewed, and where appropriate, revised its findings of fact in a light most favorable to the plaintiff, and has considered the North Carolina statutory and case law in light of those facts found. The Court finds no grounds to alter its Order granting partial summary judgment dismissing the plaintiff's claim for punitive damages.

Signed: December 12, 2006

Robert J. Conrad, Jr.
Chief United States District Judge